389 So.2d 850 (1980)
ASHLEY-HALL INTERIORS, LTD., INC.
v.
BANK OF NEW ORLEANS.
No. 10791.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1980.
*851 Milling, Benson, Woodward, Hillyer, Pierson & Miller, Charles A. Snyder and W. Richard House, Jr., New Orleans, for plaintiff-appellant.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, J. David Forsyth, New Orleans, for defendant-appellee.
Before SAMUEL, GULOTTA and BOUTALL, JJ.
SAMUEL, Judge.
Plaintiff filed this suit against the Bank of New Orleans & Trust Company to recover $26,344.21, representing the total amount of checks allegedly forged or altered by plaintiff's bookkeeper and paid by the defendant bank.
Defendant answered, denying liability, and affirmatively pled plaintiff is precluded from collecting any sums because its negligence substantially contributed to the making of the forgeries and alterations, and because plaintiff failed to exercise reasonable care and promptness in examining monthly statements of account and cancelled checks returned with it.
After a trial on the merits, judgment was rendered in favor of the defendant, dismissing plaintiff's suit. Plaintiff has appealed.
The record shows plaintiff is a small corporation doing business in New Orleans, where it provides commercial and residential interior design, decoration and furniture. It has three to four employees. Joe L. Morrow, plaintiff's vice president and general manager, dealt with clients and provided interior design services in their homes or offices. Consequently, he was not on the corporate premises for approximately 90% of the time.
Plaintiff had one bookkeeper, with the responsibility for writing checks on corporate accounts, paying bills, making deposits, recording accounts receivable and payable, and maintaining inventory controls. Prior to October, 1976 plaintiff had employed other bookkeepers who performed these functions with no incident. On October 11, 1976 plaintiff hired one Natalie Morgan to replace its previous bookkeeper. Her references were checked, and the information gathered thereby indicated no problem in her job capability and honesty. During the term of her employment the corporation was unaware of any incident indicating the original information was incorrect.
Plaintiff had its corporate checking account at International City Bank, which went into liquidation in early December, 1976. Defendant then took over the checking accounts formerly maintained at International City Bank, including plaintiff's, on December 5, 1976.
Beginning in January, 1977 through June 3, 1977, Mrs. Morgan apparently began to forge authorized signatures and raise amounts on plaintiff's checks.[1] During this period 56 separate checks were drawn in various amounts, with 51 payable to Mrs. Morgan, three to one Jerry Lee Morgan, one to Delta Air Lines, and one to a mail order house. Mrs. Morgan cashed the checks with various tellers at several of defendant's branches. On five occasions she cashed two checks made payable to herself on the same day and on one occasion she cashed three checks made payable to herself on the same day.
Plaintiff argues that for defendant to prevail it must first prove it exercised due diligence in handling plaintiff's account and only then can it show negligence attributable to plaintiff substantially contributed to the making of the unauthorized signatures. The trial judge did not assign reasons for judgment, but his judgment in favor of *852 defendant impliedly indicates he held for the bank on both issues.
Defendant urges this court to hold plaintiff did not prove the checks in suit were forgeries or alterations and to maintain the trial court's judgment under the manifest error doctrine.[2] There is much in the record to justify such action on our part. However, the trial judge's silence does not establish he concluded as a matter of fact that plaintiff failed to carry that burden of proof. Consequently, we choose to decide the case on its other issues.
The applicable law is set forth in R.S. 10:3-404 and 10:3-406, as follows:
"(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; but it operates as the signature of the unauthorized signer in favor of any person who in good faith pays the instrument or takes it for value.
(2) Any unauthorized signature may be ratified for all purposes of this Chapter. Such ratification does not of itself affect any rights of the person ratifying against the actual signer." LSA-R.S. 10:3-404.
"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business." LSA-R.S. 10:3-406.
Also relevant is R.S. 10:4-406, which provides in pertinent part as follows:
"(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.
(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank
(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and
(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.
(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item." LSA-R.S. 10:4-406.
The circumstances of this case clearly show the plaintiff was guilty of negligence which substantially contributed to the forgeries and material alterations and that the defendant bank made payment on the checks in good faith in accordance with reasonable commercial standards.
The preclusion doctrine set forth in R.S. 10:4-406, quoted above, previously was used by this court to deny recovery against a bank for paying forged checks. In Victory Electric Works, Inc. v. Maryland Cas. Co.,[3] based on former R.S. 6:53, we stated that a bank's liability for payment of forged checks ends at the time the bank's action becomes knowable to the depositor upon return of the cancelled checks unless the *853 depositor then notifies the bank. This doctrine was carried forth and expanded in R.S. 10:3-406, which now only requires that the depositor's negligence substantially contributes to an unauthorized signature or material alteration; it need not be proved that the depositor's negligence was the proximate cause.
Mr. Morrow had direct authority over the actions and procedures of Mrs. Morgan; no one else exercised any such authority. However, he exercised almost no supervision or review of her actions following a short time after she was hired. She had unrestricted access to the checks, to the mail, to the books and financial records of the company, and she handled almost all of the company's banking transactions. Even though Mr. Morrow had charge of the corporation's financial operation, he exercised almost no supervision over Mrs. Morgan's activities.
In addition, Mr. Morrow signed checks which were not filled in, thereby affording Mrs. Morgan the opportunity to raise their amounts and to make herself payee. It was admitted that at least twenty-two of the checks sued upon were signed prior to being processed through plaintiff's check printer. Further, Mr. Morrow failed to examine plaintiff's monthly bank statements, which began to contain cancelled checks with forgeries and obvious alterations beginning December 31, 1976. In effect, Mr. Morrow admitted he would have detected many of the embezzlements had he reviewed the bank statements, a conclusion we believe is self-evident.
In addition, Mr. Morrow did not examine the company's cash disbursement journal, in which were recorded all checks written on plaintiff's account. The journal indicated there were no entries for many of the checks, and Mr. Morrow or any other corporate officer easily could have determined irregularities by examination of this one corporate record. Moreover, Mr. Morrow easily could have noticed discrepancies in the corporation's bank balances had he examined the statements, and he also would have noticed that on at least one occasion Mrs. Morgan paid her own utility bill by a plaintiff check.[4]
On at least one occasion Mr. Morrow inquired as to Mrs. Morgan's purchasing power in spite of her salary of $267.31 every two weeks. Mrs. Morgan attempted to reassure him with the explanation that her husband had a substantial inheritance. However, Mr. Morrow either knew then or learned shortly thereafter that Mrs. Morgan and her husband were separated. In spite of this, he made no further inquiry, nor did he investigate the corporate records or books.
Plaintiff attempts to exculpate itself from negligence by showing it operated under the supervision of a firm of certified public accountants. This avails plaintiff little since a C.P.A. basically reviewed plaintiff's financial transactions only once a year for the purpose of an audit and to prepare tax returns. Plaintiff also cites Couvillon v. Whitney Nat. Bank of New Orleans,[5] as authority for the proposition that a depositor does not guarantee the integrity or honesty of an employee to the bank. This case affords plaintiff little relief since its facts show the offending employee forged only six checks over a three week period, while approximately fifty-five checks were involved in this case from November, 1976 to the beginning of June, 1977.
Our review of the evidence and the applicable law convinces us that plaintiff was guilty of negligence which substantially contributed to the forgeries and alterations of the checks in suit.
Numerous witnesses testified with regard to the defendant's check verification procedures at both the teller and check processing levels. Customer signatures were verified *854 at both levels on commercial accounts such as that used by plaintiff. The basic tenor of the testimony was that defendant teller procedures involved comparison of the check presented for payment with a microfilm reproduction of the signature card, except when the maker's signature was known to the teller. At the bookkeeping or check processing level, the testimony indicates the bookkeeper made another comparison of the signature on each check processed with the original signature card.
Gary Saluzzo, a former employee of defendant, was called by plaintiff under cross-examination. He testified as stated above, and indicated the discretion afforded each teller depended upon the teller's familiarity with the customer and the signature on the check. Defendant points out in connection with this testimony that Mrs. Morgan, handling basically all of the plaintiff's banking transactions, was often seen at the bank and the tellers were familiar with her, so that little suspicion would have been aroused to provoke a teller to check a microfilm reproduction of the signature card. Ruth Mauer, an employee in the defendant's bookkeeping department for approximately 22 years, testified she verified signatures for 20 years and had responsibility over plaintiff's account. She stated signatures were checked daily, and that when any problem arose with regard to signatures she would bring the checks to the attention of a supervisor. She also said, however, no suspicion ever arose regarding plaintiff's checks and there was nothing unusual about several checks payable to the same payee appearing on the same date.
Carol Meunier, a teller at defendant's Prytania Street branch, testified she received 6 or 7 of the checks involved in this law suit. She confirmed other testimony regarding defendant's verification procedures and recalled nothing suspicious about plaintiff's checks. She testified that under normal procedures she reported irregularities to a superior, and she also noted some of the checks were cashed at drive-in windows, where verification of signatures was done more thoroughly because of the absence of personal contact between the teller and the bank customer.
Joyce Wolfe, defendant's bookkeeping assistant manager and Ms. Mauer's supervisor, testified favorably as to Ms. Mauer's job performance and ability. She also explained that defendant made special efforts to examine the check processing procedures of International City Bank (where plaintiff's account originally was placed) to be sure they were consistent with those of defendant, and indicated ICB's check matching procedures were similar to those of the defendant.
Defendant also called Cary McGovern, a bank consultant, who testified as an expert in teller and check processing operations. He inspected the defendant's facilities, viewed the work of Ruth Mauer and observed BNO's general procedures. He described the defendant's teller procedures as "adequate" and "very reasonable" and stated defendant's check processing procedures were "extremely adequate". He further stated defendant was more particular than most banks in check verification and that its filing by signature afforded extra protection. According to his testimony, many banks do not check signatures as well as the defendant.
William Farrell, a handwriting expert, had to make comparisons from photocopies of the checks in suit because the originals apparently were destroyed by Mrs. Morgan. He testified Mr. Morrow's signatures on the checks were either authentic or fairly good forgeries. He also examined various original examples of Morrow's signature and pointed out it varies from day to day, thus making detection of forgeries more difficult. Mr. Farrell described Morrow's signature as a "scrawl" type which is much more easily forged than a neat or precise signature style.
Defendant urges, and we conclude, that its policy and procedures regarding verification of customer signatures are in conformity with reasonable banking procedures and meet the "reasonable commercial standards" test of R.S. 10:3-406.
*855 Plaintiff further contends that, even if we hold in favor of the defendant, it is nevertheless entitled to recover $10,795.58, represented by the checks forged by Mrs. Morgan during the month of May and the first three days of June. The authority for this assertion is Victory Electric Works, Inc. v. Maryland Cas. Co.,[6] discussed above. We concede that the manner in which Victory is summarized and digested in the West reporter indicates plaintiff's argument has merit. However, a careful examination of the case reveals the trial court so held, but the defendant neither appealed nor answered the appeal of the plaintiff. Therefore, the question now being considered was not before the Victory court for decision. In addition, the statute under which Victory was decided, R.S. 6:53, has been repealed and the matter is now controlled by the above quoted R.S. 10:4-406.
Finally, we do not agree with the alternative plaintiff argument that the defendant is liable for forged or altered checks paid by the bank within fourteen days from the date of the first bank statement containing evidence of forgeries or alterations. The above quoted R.S. 10:4-406 (1) and (2) clearly state that a bank customer must exercise reasonable care and promptness to examine the statement and items for the purpose of discovering unauthorized signatures or alterations of an item and thereafter must promptly notify the bank of such discovery. In the absence of this examination, discovery and notice, the customer is precluded from asserting against the bank such unauthorized signatures or alterations. As we have said, the plaintiff did not comply with the duty imposed on it, the defendant did suffer a loss by reason of that failure and there was ordinary care on the part of the bank in paying the items.
For the reasons assigned, the judgment appealed from is affirmed.
AFFIRMED.
NOTES
[1] It was shown at trial that some of the checks in question were "raised," i.e., the amounts for which they were initially made payable were increased by changing the amounts thereon.
[2] Arceneaux v. Domingue, La., 365 So.2d 1330; Canter v. Koehring Company, La., 283 So.2d 716.
[3] La.App., 230 So.2d 287.
[4] There is also evidence to indicate Mrs. Morgan converted customer cash payments to her own use and took part in thefts of merchandise worth approximately $10,000 in conjunction with another former employee.
[5] 218 La. 1096, 51 So.2d 798.
[6] Supra, note 3.