618 So.2d 509 (1993)
ELLIOTT B. BLACK, III, M.D., A Professional Medical Corp., and Elliott B. Black, III
v.
WHITNEY NATIONAL BANK.
No. 92-CA-1258.
Court of Appeal of Louisiana, Fourth Circuit.
April 28, 1993.
John F. Landrum, Jay Corenswet and Frank Fontenot, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for defendant/appellant.
Frank M. Buck, Jr. and Robert L. Manard, New Orleans, for plaintiff/appellee.
Before ARMSTRONG, JONES and WALTZER, JJ.
WALTZER, Judge.
This appeal is from a February 14, 1992 judgment in favor of Elliott B. Black, III (hereinafter "Dr. Elliott Black" or "Dr. Black") and Elliott B. Black, III, M.D., A Professional Medical Corporation (hereinafter "the corporation") for $84,814.06 plus legal interest and costs against Whitney National Bank (hereinafter "Whitney"). It also grants judgment in favor of Whitney and against third party defendant Elizabeth Barksdale Nix Jones (hereinafter "Dale Jones") for 50% contribution. Whitney appeals, raising the following specifications of error:
1. The trial court erred in failing to find that Black was negligent and thus barred from recovery.
2. The trial court erred in failing to grant Whitney's exception of prescription.
3. Alternatively, the trial court erred in failing to find that Whitney's liability is limited to the amount remaining in its hands in Jones' account.
4. Alternatively, the trial court erred in failing to grant Whitney full indemnity from Jones.
*510 Initially we note that the instant case is not the typical employer-employee embezzlement case. In the instant case, the employer clothed the employee with authority well beyond the norm of usual employer-employee situations. This clothing of authority was accomplished by joint bank accounts and signature authority on bank accounts. The clothing of authority held the employee out to the banking community as having authority to engage in the questioned transactions.

I. BACKGROUND FACTS
Dr. Black was Board certified in plastic surgery in 1977. He entered practice with Dr. George Haufman, a plastic surgeon. He did not split fees with Dr. Haufman, but rather he paid Dr. Haufman a flat fee for the use of his office and personnel. Dr. Haufman's office manager was Elizabeth Barksdale Nix Jones, also known as "Dale Jones" and "Dale Nix". Dale Jones handled all of Dr. Haufman's accounts receivables, billing, and bank deposits, as well as all other aspects of office administration. Dr. Black and Miss Jones experienced a warm employer-employee relationship to the extent that while he was in practice with Dr. Haufman, Dr. Black opened a joint checking account with Ms. Jones. The Hibernia account was entitled "Dr. Elliott Black III or Elizabeth Barksdale Nix Jones". Dr. Black authorized Jones' signature authority on this account. The statements were mailed not to Dr. Black's home or office, or to the home of Dale Jones and her husband, but rather to Dale Jones' next door neighbor's address. No duplicate statements were requested to be sent to Dr. Black. Dr. Black testified that he deposited "something over $70,000.00" into this account for Ms. Jones' use. Black testified that this money represented loans that he was making to Ms. Jones. He said that he was comfortable making loans of such magnitude to Jones because she was a close friend of his wife. His wife, a neonatologist in her own right, testified that she did not know Black was lending money to Jones, that Black never told her, and that during this same period of time her salary as a resident was $26,000-28,000 annually.
After a year and a half with Dr. Haufman, Dr. Black moved to 1315 Foucher to open his own practice, taking Dale Jones with him. Dr. Black testified that Dale Jones and her husband divorced either just before or just after she left Dr. Haufman's office. Dr. Black paid Dale Jones a salary of $24,000 annually. As she had done at Dr. Haufman's office, Dale Jones was Dr. Black's office manager. Dr. Black chose to use the same system that Dr. Haufman had used, to name Dale Jones his office manager, and to put her in charge of all accounts receivables, billing, and bank deposits.
The $70,000 deposited in the joint account is not at issue, as Dr. Black admits that those amounts were loans to Dale Jones. Also not at issue is a December, 1989 check representing a cash rebate on a car purchase from Stephens Imports.
At issue in the instant case is $84,814.06 which Dr. Black alleges that Dale Jones stole by forging his endorsement on checks payable to him. In addition to this suit, Dr. Black also filed a second suit against First City Bank seeking to recover an additional $206,000. Thus the total amount claimed is approximately $300,000 or roughly one year's annual gross income of the corporate surgical practice. The checks run from December, 1980 through January, 1989 or a nine year period. In 1986, Dr. Black hired Ms. Nazareth Romen to work in his office with Dale Jones.
Dr. Black's income is derived from several sources.
From 1979 to 1989, Dr. Black was Chief of Plastic Surgery at the Veterans Administration Hospital. Although Dr. Black intimated that the Chief of Plastic Surgery salary at the Veterans Administration would be insufficient to cover his parking costs, we are unable to ascertain what that salary was because no W-2 or W-4 for that salary is attached either to Dr. Black's corporate return for the entity "Elliott Black Inc." or to his personal return which is attached to the back of the Katz deposition. Both the personal and the corporate tax returns do not itemize income, but rather *511 list only a lump sum. Dr. Black testified that it was not necessary to include the V.A. salary in the corporate income stream as it was paid to him personally and not to the corporation and that taxes were already withheld, but we are still unable to determine the amount of the salary. Dr. Black testified that the V.A. salary checks are personally handed to him at the V.A. Hospital and he must sign to indicate that he has received the check. Dr. Black testified that he then gave Dale Jones these checks to deposit.
In addition to the V.A. salary, Dr. Black derived substantial income from his plastic surgery practice. He testified that usually he only charges for surgeries and does not charge for office visits. The corporate income tax returns for the plastic surgery practice indicate gross income of $330,079 in 1981, $285,582 in 1982, $267,074 in 1983, $243,026 in 1984, $250,221 in 1985, $324,169 in 1986, $223,635 in 1987, $234,932 in 1988, and $290,392 in 1989. The joint individual income tax returns of Elliott B. and Sheila G. Black indicate wages of $199,298 in 1981, $224,007 in 1982, $183,555 in 1983, $175,436 in 1984, $123,665 in 1985, $132,113 in 1986, $156,549 in 1987, $137,867 in 1988, and $115,805 in 1989. We are unable to determine the amount of Dr. Sheila Black's wages and the amount of Dr. Elliott Black's wages because no W-2 or W-4 forms are attached and only a total lump sum is listed on the return.
The record indicates that Dr. Black has 5 checking accounts:
1. "Dr. Elliott Black or Elizabeth Barksdale Nix Jones"-Hibernia;
2. "Dr. Elliott Black III, Inc." (Corporate Account)-Whitney;
3. "Dr. Elliott Black III Medical Media Account" (Advertising Account)-Whitney;
4. "Elliott Black Properties" (Investment Account)-Whitney;
5. Joint checking account with his wife-Whitney.

II. PROCEEDINGS IN THE TRIAL COURT
On October 18, 1989, Dr. Black filed suit against Whitney seeking reimbursement for approximately $100,000 worth of checks which Dale Jones had deposited either directly into her own checking account or into the joint account and then into her own account. Dr. Black alleged that he confirmed the situation in March, 1989, at which time he fired Dale Jones. Dale Jones has not left the jurisdiction and at the time of trial continued to reside on Sixth Street. Additionally, Dr. Black has never filed a police report or otherwise sought prosecution.[1] Rather Dr. Black filed suit against Whitney for accepting the forged checks.
Whitney answered the suit asserting affirmative defenses including allegations that Dr. Black's failure to use due diligence to detect the 9 year period of forgery constituted negligence, that Dr. Black's failure to use ordinary care substantially contributed to the forgery, that Dr. Black was negligent in failing to use his prepackaged accounting system in the manner required by the manufacturer, that Dr. Black held Dale Jones out to the banking community as having greater authority than would normally attend an employer-employee relationship by maintaining joint checking accounts, giving Dale Jones signature authority on accounts, by giving her loans without documentation, and by creating a course of dealing with Dr. Black's knowledge and consent that clothed Dale Jones in the authority to present the forged endorsement checks as credible. The Whitney further alleged prescription on the *512 grounds that the last check was negotiated before October 18, 1988, the applicable prescriptive period is one year and suit was not filed until October 18, 1989.
Whitney filed a third party demand against Dale Jones and eventually Dr. Black amended his petition to assert a claim against her as well. The court does not have the benefit of Dale Jones' version of the facts. We do not know if Dale Jones would testify that the sums at issue were embezzled or if they were also loans or gifts arising from their warm employer-employee relationship. We do not know if Dale Jones would testify that she endorsed the checks on her own authority or that Dr. Black told her to endorse the checks on his behalf and that the checks were gifts or loans to her from Dr. Black. When Dale Jones testified at trial and at deposition, she took the Fifth Amendment on every question.
Dr. Black testified that his mail was delivered into a mail slot at his office. The mail slot emptied into a locked box. He would remove the checks from the locked box, browse through the checks and then give them to Dale Jones to deposit. Dale Jones would enter the checks onto the day sheet, write out the deposit slips and make the deposits. She would also note payments on the client's general ledger card and issue subsequent billing. Dr. Black used a prepackaged accounting system designed such that one entry would also imprint upon the day sheet, individual client ledger, and general accounting journal such that the various components acted as checks and balances upon each other. Instead of using the Controlofax[2] system as designed, Dale Jones used the day sheet as a giant running deposit slip. Dr. Black further testified that he generally browsed through his bank statement every month to ascertain his balance, but that he did not check the deposits, hence he never discovered that his V.A. salary checks were not being deposited to his account. He specifically did not check his deposit slips against his bank statement and he did not check every item on his bank statements. Dr. Black testified he goes to Mexico annually. While he was in Mexico, he intentionally left the locked mail box open. He conjectured that during this time Ms. Jones may have had a locksmith make an additional key for the box so that she could intercept the checks. No proof that this had occurred was presented at trial; no duplicate key was produced; no paid locksmith bill was produced; no locksmith was called to testify. Dr. Black had also admitted that he gave Dale Jones the checks after he looked at them.
The trial court found that the Whitney erred in failing to check the endorsement signatures on a third party second endorsement check and for that reason found Whitney liable. The trial court committed an error of law.

III. DISCUSSION
R.S. 10:3-406 provides:
"Any person who by his negligence substantially contributes ... to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."
*513 The trial court seemed to have predicated its ruling upon three premises:
1 A bank's failure to compare signatures on every third party second endorser check is not in accordance with reasonable commercial standards of the banking industry.
2 Dr. Black could not have prevented the embezzlement.
3 Doctors do not want to be responsible for the business administration of their office.
The trial court's holding that a bank's failure to compare signatures on every third party second endorser check is not in accordance with reasonable commercial standards of the banking industry has far reaching implications for the banking industry as a whole. The trial court stated in its written reasons for judgment:
"... the bank must make a threshold showing that it followed reasonable commercial standards. LSA-R.S. 10:3-406; Confederate Welding v. Bank of the Mid-South, 458 So.2d 1370 (La.App. 2nd Cir.1984). Along those lines, the only evidence offered by the bank as to reasonable commercial standards was the self-serving testimony of a recently hired employee of Whitney National Bank, Mr. John Laviolette. Mr. Laviolette admitted that it was his pre-trial testimony that if a teller is presented with items such as involved in this case on a regular basis, it should alert the teller to make inquiry as to whether the bank should handle such items for deposit into an individual's personal checking account." (Emphasis supplied).
The reasons for judgment fail to mention the testimony of Mary Gates, Assistant Cashier and Assistant Security Officer at Whitney who testified that the teller refers such a question to an officer of the bank and the officer, following procedures in the Whitney Operations and Security Manual, researches the presenter of the check and makes any such determinations. Mary Gates stated that she reviewed Dale Jones' account history and found that her banking relationship was first established in 1976 and that there were also some trust account relationships and some minor account relationships as well as signature authority on other of Dr. Black's accounts. In checking accounts, Dale Jones had balances as high as $12,000.00 and in savings accounts, balances as high as $19,000.
The reasons for judgment also fail to mention the testimony of Jonathan Rodriguez, Whitney Retail Operations. Like Mary Gates, Jonathan Rodriguez had also been trained as a teller prior to his promotion to assistant cashier and later promotions. Rodriguez testified, as had Gates, that the officer looks to the person presenting the item and that person's history with the bank. Does the presenter have a banking relationship with the bank? How was that relationship established? What are the account relationships? How long have those relationships been in existence? How does the presenter maintain her activities with the bank? He further testified that Ms. Jones' relationship with the Whitney rated favorably. Her relationship with the Whitney started sometime in the 70s, she had several accounts with the bank including a trust account[3], her family had several accounts with the bank, she had substantial account balances and the activity on her account was always favorable.
John Laviolette testified that he is currently Sales Manager at the Whitney where he has been for one month. Previously he was with Oak Tree Savings Bank for sixteen years, where he was Branch Administrator for the last five. As Branch Administrator, Security reported to him. Prior to that position, he had been the Security Officer. He had also served as Regional Manager, a Branch Manager, and a teller. He has been involved in investigations of forged endorsements for 9 years, during which he approved and authorized policies, shared information with other banks throughout the nation, attended various security seminars and examined security procedures from other banks. He testified that the policies of Oak Tree, Whitney, and the other banks throughout *514 the nation are substantially similar. Laviolette discussed Oak Tree's policies relative to accepting second endorsement checks:
"Q. Could you describe Oak Tree's policies for me?
A. The policy for accepting a second endorsement would be that we would have to, number one, be aware of such an endorsement and the teller should be somewhat alerted if that endorsement is presented to them. Depending on the individual presenting the endorsement would have a great deal to do with how the teller would handle that transaction. The guidelines would be that that individual should be an established customer and dependent upon that, would determine how the teller would handle that transaction.
Q. Could you tell the Court some of the factors in determining an established customer?
A. The length of time the customer is dealing with the bank, the average balance that may exist in their account, and the significant negative activities regarding returned items against their account. Other related accounts they may have with the bank.
* * * * * *
Q.... if Oak Tree had the same relationship that Whitney had with Ms. Nix, would you have accepted that deposit into Ms. Nix personal account?
A. Yes, they would have accepted that deposit."
Laviolette testified that it would not be commercially reasonable for a large bank such as Whitney, which handles over 100,000 transactions per day, to verify the signatures on all second endorser items presented, even where the first payee had an account at the Whitney, because the verifications would have to be done by hand by the teller and would unreasonably slow banking operations. In many cases, however, a bank would never have the first endorser's signature on file because that person is not a customer of the bankonly the person seeking to negotiate the check, who may be the second, third, or fourth endorser, is a bank customer.
The trial court was further aggrieved by the Whitney's policy of treating checks made out to an individual with a designation behind it such as "John Doe, C.L.U., John Doe, Esq., John Doe, Ph.D., John Doe, C.P.A., John Doe, C.F.P. and John Doe M.D." as a check made out to an individual and not as a check made out to a corporation.
The trial court sought to create a category that does not exist in negotiable instrument law, namely "a business check". If the checks are made payable to "John Doe, A Professional Medical Corporation" or to "John Doe, Inc.", then the checks are made payable to a corporation, which is a separate and distinct juridical and legal person from the human named "John Doe". But if the checks are made payable to "John Doe, M.D.", then they are clearly checks made payable to the human individual, not to a corporation. There is a practical reasonnot every M.D., or C.P.A. or Esq. is either incorporated or self-employed. Some doctors and lawyers are salaried and work for large institutions. The trial court stated:
"Notwithstanding the glaring information on the face of these checks that indicated they were being paid to a doctor for services rendered which should by (sic) handled as a business check, it was Whitney National Bank's position and through the testimony of its employees, that these should be considered as personal checks".
The trial court erred in so holding. There is no such designation as "business checks" under the negotiable instrument laws of this state.
The testimony by Laviolette also indicated that Whitney did deposit two checks made out to the corporation and that it should not have deposited those corporate checks into non-corporate accounts under "reasonable commercial standards". The first corporate check so deposited was Exhibit Number 241. It is U.S. Treasury check number XXXXXXXXXXXX in the amount of $126.88 dated November 17, 1987 and made payable to "Elliott Black, III A Professional *515 Medical Corporation". The second check is Exhibit number 171 from Health Benefit Plan in the amount of $3200.00 and made payable to "Elliott B Black III P C". Whitney has admitted that it made a mistake on these two checks. The other 427 checks were not made payable to the corporation.
Turning to the questions of Dr. Black's negligence, Dr. Black could have easily instituted internal controls for accounts receivable in his office as follows:
1. Have mail sent to a post office box located in a U.S. Post Office.
2. Only Dr. Black personally retrieves the mail from the post office box. Since Dr. Black testified that he only receives 5-10 checks a week, he need only check the mailbox once a week.
3. Upon retrieval of the mail, Dr. Black makes out the deposit slips in triplicate. One copy he keeps in the deposit book and uses to check against his bank statement when it arrives; his office worker takes the other 2 copies with her to the bank where both are stamped as deposited by the bank. The bank keeps one copy and gives the other copy to her. She returns the stamped copy to Dr. Black. Whereupon Dr. Black checks it against the deposit slip in his book.
If he wants to protect his billing as well, in addition to the above steps, all he need do is tell his office worker to bring him the ledger cards for the clients whose checks he picked up from the mail box that day. He then notes in his own handwriting the amount paid and the date. He does not allow his office employee to retype the ledger card, but rather uses photocopies of the cards with his own handwritten notations as bills. Alternatively, he could use the Controlofax System as designed and simply have the office worker bring him the appropriate forms on the pegboard. He could make the payment entries on the Controlofax System himself. Since he testified that he receives only 5 to 10 checks per week, it would only take him 10-20 minutes one day per week. Lastly, he could have his accountant Joe Williams into the office one day per month to close out that month's books. The expense would be minimal and deductible as a business expense.
Testimony was also provided that doctors as a class do not want to manage the business aspect of their sole practices. Whether sole practitioners want to do something or not is irrelevant. A sole practitioner has certain rights, but also certain responsibilities imposed upon him by law. If he does not want to handle those responsibilities, he can go into partnership with another doctor who will assume the business management for a greater percentage of the partnership income or for a flat fee.
The Fourth Circuit case of Ashley-Hall, Etc. v. Bank of New Orleans, 389 So.2d 850, 853-4, (La.App. 4th, 1980) is controlling. In that case the court stated:
"Mr. Morrow had direct authority over the actions and procedures of Mrs. Morgan: no one else exercised any such authority. However, he exercised almost no supervision or review of her actions following a short time after she was hired. She had unrestricted access to the checks, to the mail, to the books and financial records of the company, and she handled almost all of the company's banking transactions. Even though Mr. Morrow had charge of the corporation's financial operation, he exercised almost no supervision over Mrs. Morgan's activities.... Moreover, Mr. Morrow could have noticed discrepancies in the corporation's bank balances had he examined the statements ... Gary Saluzzo, a former employee of defendant, was called by plaintiff under cross-examination. He testified as stated above, and indicated the discretion afforded each teller dependent upon the teller's familiarity with the customer and the signature on the check. Defendant points out in connection with this testimony that Mrs. Morgan, handling basically all of the plaintiff's banking transactions, was often seen at the bank and the tellers were familiar with her, so that little suspicion would have been aroused to provoke a teller to check *516 a microfilm reproduction of the signature card."

IV. CONCLUSION
In conclusion, the trial court committed errors of law in its ruling. Dr. Black's negligence substantially contributed to the making of an unauthorized signature and he is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who paid the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business. Thus on the merits, the trial court erred and the judgment should be reversed.
Turning to the issue of prescription, we note that Dr. Black conceded that one year is the applicable prescriptive period[4]. Dr. Black argued, however, that the doctrine of contra non valentem agere nulla currit praescriptio applies such that prescription does not begin to run until the injured party discovers or should have discovered the facts upon which his cause of action is based. When Dr. Black pled contra non valentem, the burden of proof was upon him to prove contra non valentem. Dr. Black failed to carry his burden of proof. As discussed above, throughout the nine year period of embezzlement, Dr. Black should have discovered the facts when he checked the deposits listed on his bank statements. Accordingly, the trial court erred in failing to grant the exception of prescription and the judgment should be reversed.
For the reasons discussed, the judgment of the district court is reversed and the exception of prescription is granted.
REVERSED.
NOTES
[1] If Dr. Black had filed charges, Dale Jones could have been prosecuted under R.S. 14:67(B) theft, R.S. 14:71.1 bank fraud, and R.S. 14:72 forgery and the respective lesser included offenses thereunder. Each of those offenses carry a term of not more than ten years imprisonment with or without hard labor. C.Cr.P. Art. 573 provides that time limits for prosecution runs from the time Dr. Black severed the relationship or from March, 1989. C.Cr.P. Art. 572 provides that the time limit for the prosecution of this situation is four years. Thus as of March, 1993, Dale Jones can no longer be criminally prosecuted under state law. We note that if Dr. Black had wanted to deduct the losses from his taxes, he would be required to have a police report as proof of loss.
[2] The prepackaged accounting system used by Dr. Black was referred to as a "One-Write" system in the briefs. The term "One-Write" was used in a generic sense, meaning a system whereby various accounting forms are layered atop each other on a peg board with carbon or carbonless transference chemicals in appropriate spots such that writing upon the top form automatically updates all of the forms layered thereunder. Dr. Brown did not use the product with the trade name "One-Write" which is manufactured by McBee. The principle difference between the One-Write system and Controlofax system is the One-Write system has a column for contractual (fee) adjustments, whereas the Controlofax system has no such column. Dr. Brown's expert, Robert Katz, testified that it is possible to embezzle while using a One-Write system by McBee by taking money or checks and then writing them off under the contractual adjustment section of the One-Write sheet. Apparently, he was not aware that Dr. Brown used the Controlofax system which has no contractual adjustment section for write-offs.
[3] Dale Jones is the granddaughter of a doctor. Trusts were created on her behalf.
[4] "The parties do not dispute that the applicable prescriptive period is one year." Memorandum In Opposition To Peremptory Exception of Prescription, p. 1 submitted by plaintiffs Elliott B. Black, III M.D., A Professional Medical Corporation, and Elliott B. Black, III Jan. 2, 1990.