GAIDRY, J.
DA bank appeals a summary judgment against it, holding it liable to a physical therapy business for the total amount of 189 checks converted by the business’s employee and deposited in her checking account with the bank. In conjunction with the appeal of the summary judgment, it also seeks review of a prior interlocutory judgment overruling a peremptory exception of prescription. For the following reasons, we reverse the interlocutory judgment and sustain the peremptory exception as to the first 146 of the 189 checks, reverse the summary judgment, and remand the matter for further proceedings on the plaintiffs remaining claims.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
The plaintiff, Peak Performance Physical Therapy and Fitness, L.L.C. (Peak), is a professional physical therapy business owned by three physical therapists. It employed a bookkeeper, Rebecca Tassin, whom it subsequently determined had embezzled the sum of $182,089.31 over the course of approximately three and a half years, nearly the entire time it had employed her. Ms. Tassin had deposited checks made payable to either Peak or its individual therapist members-partners into a joint checking account in the names of her and her husband, Keith Tassin, at *529 Hibernia National Bank, now Capital One, N.A. (Capitol One).
Peak filed suit against Capital One and the Tassins on November 24, 2004. In its petition, it alleged that Rebecca Tassin was employed as Peak’s bookkeeper and collections and billing manager for three and a half years prior to her termination. In that capacity, she was “responsible for collecting accounts receivable, processing payments, making deposits, and reconciling customer accounts.” It further alleged that “[o]ver the course of the prior three years,” Ms. Tassin “embezzled numerous checks” made payable to |sPeak or its members-partners by depositing them into the joint checking account she and her husband, Keith Tassin, maintained at Capital One. Peak alleged that Capital One “passively allowed” the embezzlement of its funds, as it knew or should have known that the Tassins were not Peak’s proprietors and that they had no ownership in or right to the proceeds of the checks deposited into their account. It prayed for judgment in its favor for the loss of income represented by the amount of the embezzled checks, the cost of its investigation, loss of its reputation in the community, and other damages, as well as attorney fees, costs, and “interest from the date each act of embezzlement occurred.”
On February 5, 2007, Capital One filed a peremptory exception of prescription, asserting that all of Peak’s claims relating to checks deposited into the Tassins’ checking account prior to November 24, 2003 were prescribed. In connection with the hearing on the exception, the parties filed a joint stipulation as to the respective amounts of all checks deposited before ($133,772.36) and after November 24, 2003 ($48,316.95), The exception was heard on April 16, 2007. At the conclusion of the hearing, the trial court ruled that it would overrule the exception. Its judgment to that effect was signed on May 3, 2007, and contained the following decretal language:
IT IS ORDERED, ADJUDGED AND DECREED that there be final judgment in favor of the Plaintiff, Peak Performance Physical Therapy, LLC, and against the Defendant, Capital One, N.A. (⅞/a Hibernia National Bank, denying the Peremptory Exception of Prescription in the above captioned matter, with prejudice. (Emphasis supplied.)
On May 11, 2007, Capital One moved for a new trial on its exception, on the grounds that the trial court’s judgment was contrary to law and improperly designated as “final” and “with prejudice.” On August 2, 2007, Peak filed a motion for summary judgment, seeking judgment on the merits |4of its claims, finding Capital One solely at fault and liable for the total amount of all checks deposited without authorization. The parties agreed to have both motions heard on August 20, 2007.
Following the hearing of August 20, 2007, the trial court ruled that it would grant Peak’s motion for summary judgment. Its judgment to that effect awarded Peak the sum of $182,089.31, together with interest and costs, was signed on September 11, 2007, and also denied Capital One’s motion for new trial as moot. Capital One has suspensively appealed that judgment, as well as the interlocutory judgment denying its peremptory exception of prescription. In addition to the parties’ appellate briefs, an amicus curiae brief has been submitted by the Louisiana Bankers Association.
ASSIGNMENTS OF ERROR
Capital One contends that the trial court erred in the following respects:
1. The trial court erred in overruling Capital One’s peremptory exception of prescription.
*530 2. The trial court erred in designating its judgment overruling the peremptory exception of prescription as a “final judgment” denying the defense of prescription “with prejudice.”
3. The trial court erred in applying the doctrine of contra non valentem non cur-rit praescriptio.
4. The trial court erred in granting Peak’s motion for summary judgment.
As amicus curiae, the Louisiana Bankers Association urges this court to grant Capital One the relief sought on the issues of prescription, the | sinapplicability of the doctrine of contra non valentem, and Peak’s comparative fault.
STANDARD OF REVIEW
This matter comes to us on appeal from a summary judgment. It is therefore subject to de novo review as to whether summary judgment was appropriate. Motorola, Inc. v. Associated Indent. Corp., 02-0716, p. 5 (La.App. 1st Cir.6/25/04), 878 So.2d 824, 828, writs denied, 04-2314, 04-2323, 04-2326, 04-2327 (La.11/19/04), 888 So.2d 207, 211, 212. In undertaking our de novo review, we employ the same standards applicable to the trial court’s determination of the issues.
The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
The mover has the burden of proof that he is entitled to summary judgment. See La. C.C.P. art. 966(C)(2). In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. Hines v. Garrett, 04-0806, p. 1 (La.6/25/04), 876 So.2d 764, 765. Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor. Willis v. Medders, 00-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050.
| .ANALYSIS

Prescription

The judgment overruling the exception did not determine the merits of Peak’s claim; thus, it is clearly interlocutory. See La. C.C.P. art. 1841. Likewise, it is well settled that a judgment overruling a peremptory exception of prescription is an interlocutory judgment and not appealable. Lawrence v. Gupta, 527 So.2d 1112 (La.App. 1st Cir.) writ denied, 532 So.2d 750 (La.1988).[1] Thus, the trial court’s erroneous designation of the interlocutory judgment as “final” and “with prejudice” had no legal effect and could not serve to bar Capital One’s assertion of the defense of prescription in another exception or at a trial on the merits. See Alex Theriot, Jr., Inc. v. Lager, Inc., 345 So.2d 1263 (La.App. 1st Cir.1977). Capital One’s assignment of error directed to the character of the judgment denying its peremptory exception has merit; thus, its fail *531 ure to appeal that judgment does not serve to preclude later review.
When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him, in addition to the review of the final judgment. Judson v. Davis, 04-1699, p. 8 (La.App. 1st Cir.6/29/05), 916 So.2d 1106, 1112-13, writ denied, 05-1998 (La.2/10/06), 924 So.2d 167. As the summary judgment in favor of Peak determined the merits of the controversy, it is clearly a final judgment. Capital One is therefore entitled to seek review of the judgment overruling its exception as part of the present appeal.
Capital One contends that Peak’s claims against it clearly are based upon conversion, and that all such claims for checks deposited into the |7Tassins’ checking account more than one year prior to the filing of suit are prescribed under La. R.S. 10:3—420(f)- Louisiana Revised Statutes 10:3-420 provides, in pertinent part:
(a) An instrument is converted when
(iii) it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.
(f) Any action for conversion ... prescribes in one year.
Ms. Tassin’s actions clearly constituted conversions under La. R.S. 10:3—420(a)(iii). If Peak’s allegations as to Capital One’s actions are accepted as true, then those actions in accepting the deposits of the misappropriated checks and thereby making payment to Ms. Tassin would also constitute conversions within the meaning of the statute. See Med Data Serv. Bureau, L.L.C. v. Bank of La. in New Orleans, 03-2754, pp. 9-10 (La.App. 1st Cir.12/20/04), 898 So.2d 482, 488-89.
Generally, the party pleading prescription has the burden of proving the facts supporting the exception. Quality Gas Products, Inc. v. Bank One Corp., 03-1859, p. 4 (La.App. 1st Cir.6/25/04), 885 So.2d 1179, 1181. Based upon the parties’ stipulations regarding the dates and amounts of the various deposits in the Tassins’ checking account, Capital One established a prima facie case of prescription of all claims for conversion based upon the 146 checks deposited prior to November 24, 2003. See Quality Gas Products, 03-1859 at pp. 5-6, 885 So.2d at 1182, and Metro Elec. & Maint., Inc. v. Bank One Corp., 05-1045, pp. 4-8 (La.App. 3rd Cir.3/1/06), 924 So.2d 446, 449-51.
| sCapital One having established a pri-ma facie case of prescription as to the 146 checks deposited over a year prior to suit being filed, the burden of proof that those claims were not prescribed shifted to Peak. As the party asserting the benefit of contra non valentem, Peak bore the burden of proof of its requisite elements and applicability. See Black v. Whitney Nat’l Bank, 618 So.2d 509, 516 (La.App. 4th Cir.), writ denied, 623 So.2d 1308 (La.1993). Peak contends that Louisiana courts have expressly recognized and applied the doctrine of contra non valentem to invalidate the defense of prescription in check conversion cases, citing in particular the case of LaCombe v. Bank One Corp., 06-1374 (La.App. 3rd Cir.3/7/07), 953 So.2d 161, writ denied, 07-0746 (La.6/1/07), 957 So.2d 177. Several other cases in the jurisprudence have also addressed the issue of contra non valentem in actions against banks for check conversion, and seem to have assumed, without analysis, that the doctrine is properly applicable to such ac *532 tions. See, e.g., Black, 618 So.2d at 516; Riceacres, Inc. v. Hayes, 93-310 (La.App. 3rd Cir.2/2/94), 631 So.2d 703; Metro Elec., 05-1045 at p. 6, 924 So.2d at 450. The court in LaCombe expressly conceded that contra non valentem “is an equitable doctrine of Roman origin, with roots in both civil and common law, and is notably at odds with the public policy favoring certainty underlying the doctrine of prescription.” 06-1374 at p. 3, 953 So.2d at 164. Here, we are squarely confronted with the threshold legal issue of whether the doctrine has application to the issue of prescription under La. R.S. 10:3 — 420(f). This issue must be resolved before considering the factual issues upon which Peak bases its invocation of the doctrine.
At the time Peak’s causes of action arose, La. R.S. 10:1-102 provided, in pertinent part:
|fl(l) This Title shall be liberally construed and applied to promote its purposes and policies.
(2) The purposes and policies of this Title are
(a) to simplify, clarify and modernize the law governing commercial transactions;
(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
(c) to promote uniformity of the law among the various jurisdictions.[2]
In Daube v. Bruno, 493 So.2d 606, 609 (La.1986), the supreme court observed that the wording of former La. R.S. 10:3— 419(1), defining conversion (now superseded by La. R.S. 10:3-420), was “virtually identical to that of the Uniform Commercial Code” and that “the legislative aim must have been to follow the scheme, approach and technique of the Uniform Commercial Code but, as for gap filling, to refer the legal profession to the Louisiana tort law framework rather than to the common law of conversion.” In concluding that former La. R.S. 10:3-419(1) authorized only a delictual action for conversion of negotiable instruments, the supreme court also noted that “Louisiana follows the model of the Uniform Commercial Code.” Id. The court therefore held that a conversion action under former La. R.S. 10:3-419(1) was subject to the one-year liberative prescription of La. C.C. art. 3492 for delictual actions. Id. at 610.[3]
Effective January 1, 1994, former La. R.S. 10:3-419 was amended and reenacted as La. R.S. 10:3-420. The new statutory language also substantially tracks changes in the parallel provision of the Uniform Commercial Code (UCC) as promulgated by the National Conference of hnCommissioners on Uniform State Laws. Since Louisiana follows the model of the Uniform Commercial Code (UCC) in characterizing the nature of the conversion action for purposes of determining prescription, it is likewise appropriate and consistent with the law’s goal of promoting interjurisdictional uniformity to consider how other jurisdictions have resolved the issue of when the time limitations on UCC conversion actions begin.
One of the best analyses of the legal issue before us is that set forth in the case of Pero’s Steak & Spaghetti House v. Lee, 90 S.W.3d 614 (Tenn.2002). There, the Tennessee Supreme Court reviewed the nature of the “discovery rule,” the common law equivalent to one of the exceptions in Louisiana’s doctrine of contra non valen- *533 tern, and its applicability to a claim for conversion of a negotiable instrument under the UCC. It first defined the “discovery rule” as “an equitable exception that tolls the running of the statute of limitations until the plaintiff knows, or in the exercise of reasonable care and diligence, should know that an injury has been sustained.” Id. at 621. Reviewing the jurisprudence of other jurisdictions, the court noted that “the vast majority of courts hold that in the absence of fraudulent concealment on the part of the defendant asserting the statute-of-limitations defense, the discovery rule does not apply to toll the statute of limitations on an action for conversion of negotiable instruments.” Id. at 622. As the Tennessee Supreme Court also observed:
Negotiable instruments are intended to facilitate the rapid flow of commerce by providing certainty and finality in commercial transactions. These policies are best served by refusing to apply the discovery rule and by finding that the cause of action for conversion of negotiable instruments accrues when the instrument is negotiated. Of course, adoption of the majority rule also fosters uniformity, which is a fundamental objective of the Uniform Commercial Code....
Pero's Steak, 90 S.W.3d at 624. See also Menichini v. Grant, 995 F.2d 1224, 1230-31 (3rd Cir.1993), and Haddad’s of Illinois, Inc. v. Credit Union 1 Credit Union, 286 Ill.App.3d 1069, 1075, 222 Ill.Dec. 710, 678 N.E.2d 322, 326 (4th Dist.1997).
Not only does the jurisprudential doctrine of contra non valentem run counter to the general public policy of certainty underlying prescription, its application in these circumstances would further circumvent the analogous and express policies of certainty and uniformity upon which the UCC and our commercial laws adopting the UCC’s provisions are based. UCC provisions should be construed so that rights and liabilities of the parties, absent serious factual dispute, are ascertainable without resort to expensive and delaying litigation over each item that might be paid on an unauthorized signature or endorsement, thereby facilitating commercial transactions. Pargas, Inc. v. Estate of Taylor, 416 So.2d 1358, 1364-65 (La.App. 3rd Cir.1982). We therefore hold that the equitable doctrine of contra non valentem cannot be applied to suspend prescription of a cause of action for the conversion of a negotiable instrument under La. R.S. 10:3-420(f), except in the event of fraudulent concealment by the defendant asserting prescription, a limited application of the third category of contra non valentem.
Peak’s cause of action against Capital One is based upon Capital One’s “passively allowing” Ms. Tassin to embezzle the funds represented by the converted checks. Peak neither alleged nor presented evidence tending to establish any fraudulent concealment on Capital One’s part. It therefore failed to meet its burden of proof of suspension of prescription under the limited application of contra non valentem. We accordingly reverse the trial court’s judgment overruling Capital One’s peremptory exception of prescription, sustain the exception, and dismiss with prejudice all claims |12relating to the 146 checks deposited into the Tassins’ checking account prior to November 24, 2003, having a total monetary value of $133,772.36.

Summary Judgment

The general rule is that when a bank pays on a forged check, it is liable for the amount of the checks, plus legal interest from the date of judicial demand. See Marx v. Whitney Nat’l Bank, 97-3213, p. 4 (La.7/8/98), 713 So.2d 1142, 1145; Dean Classic Cars, LLC v. Fidelity Bank & Trust Co., 07-0935, p. 11 (La.App. 1st Cir.12/21/07), 978 So.2d 393, 399. But *534 there are specific statutory exceptions to that general rule, as we observed in the latter case:
A statutory exception to the general rule is provided in LSA-R.S. 10:3^105 when fraudulent indorsements are made in the name of an employer by an employee with respect to instruments payable to the employer and to which the employer has given responsibility to the employee. This exception adopts the principle that the risk of loss for fraudulent indorse-ments by employees who are entrusted with responsibility with respect to checks should fall on the employer rather than the bank that takes the check or pays it, if the bank was not negligent in the transaction. This provision is based on the belief that the employer is in a far better position to avoid the loss by using care in choosing employees, in supervising them, and in adopting other measures to prevent forged instruments in the name of the employer. Cable Cast, 729 So.2d at 1167. See also 2003 Uniform Commercial Code Comments, LSA-R.S. 10:3-405. Another statutory exception is provided in LSA-R.S. 10:3-406(a), where a person is precluded from asserting a claim against the bank acting in good faith when conduct before funds are paid out on a forged instrument substantially contributed to the loss. [Citation omitted.]
Dean Classic Cars, 07-0935 at p. 11, 978 So.2d at 399.
Under the first exception, it must be shown that the employer of the embezzling employee entrusted that employee with “responsibility” with respect to the instrument. La. R.S. 10:3 — 405(b). Such “responsibility” includes, but is not limited to, the authority “to process instruments received by the employer for bookkeeping-purposes, for deposit to an account, or for l1sother disposition.” La. R.S. 10:3-405(a)(3)(ii). Both of these statutory exceptions contemplate the allocation of comparative fault between the bank and the employer of an embezzling employee. Capital One and the amicus curiae contend that genuine issue of material fact exists as to the existence of comparative fault on Peak’s part.
The following facts were stipulated by the parties in the trial court: Rebecca Tassin applied for the bookkeeping position at Peak with high recommendations from her former employer. She was hired by Peak in February 2001, and came to be regarded as a highly trusted employee. Rebecca Tassin’s job responsibilities at Peak included, but were not limited to, opening the mail; preparing the accounts receivable deposit; making the accounts receivable deposit; posting the payments to the accounts receivable ledger; and preparing periodic management reports for Peak’s members-partners. According to the affidavits of Peak’s members-partners, Ms. Tassin “had access to [Peak’s] protocols and systems in order to perform those duties.”
In his affidavit, Mr. Purvis identified himself as a co-owner of Peak and its administrator and business manager from its inception. He testified that during the business’s early years, he had both therapy and administrative duties. He further explained that “[d]espite the fact that my therapy duties would increase from time to time, I maintained my administrative duties by increasing my work hours until, in 2004 [the year Ms. Tassin’s embezzlement was discovered], I devoted myself almost exclusively to administrative duties.” He stated that Ms. Tassin reported directly to him. He explained that “Ms. Tassin would more often than not volunteer to retrieve the mail,” that “[c]hecks/payments to the [e]ompany were received by mail and then distributed to *535 appropriate stations by the |uperson who retrieved it,” that “[a]ll of the checks/payments, EOB’s [explanations of benefits], denials, requests for further information, etc., went to Ms. Tassin,” and that “Ms. Tassin would then distribute to Theresa [Hudson] ivhatever payments and EOB’s she wanted her to post, as well as whatever denials she wanted her to work on.” (Emphasis supplied.)
Mr. Purvis’s affidavit stated that the aging receivables ledger report “was prepared pursuant to [his] oversight,” and that he prepared “all statements regarding aging reports, billed charges, accounts receivable, and income reports.” He and his two member-partners held monthly meetings with Ms. Tassin to review the aging receivables ledger report “to provide an overview of how the collections process was proceeding.” Although the evidence does not conclusively establish that the aging receivables ledger report was prepared by Ms. Tassin, the parties’ stipulation that she was responsible for “preparing periodic management reports for Peak’s members-partners” strongly suggests that she did in fact prepare that monthly report. According to Mr. Purvis’s affidavit, “Ms. Tassin concealed her embezzlement by manipulating account statuses in our system.”
In his deposition, Mr. Purvis unequivocally testified that “[Ms.] Tassin was totally in charge of handling all the mail and dispersing everything while she was there” and “in charge of ... distributing the mail to who [sic ] it needed to go to [sic ], [and] assisting in putting the deposit together. And so, it was done pretty much by her.” In contrast, at the time of his deposition, separate duties of the billing and accounts receivable collection (electronic billing; following up on denials and manual billing; posting payments to patient accounts; and past-due account collection) were generally assigned to four separate employees (“In other words, they have pretty much different jobs that they are assigned to do.”). It was only after |1RMs. Tassin’s embezzlement was discovered and she was terminated that Peak established its new process of managing its billing and accounts receivable, with distinct division of responsibilities among the clerical employees exercising those functions.[4]
Theresa Hudson was another clerical employee of Peak from July 2001 through March 2005. In her affidavit, Ms. Hudson stated that she, Ms. Tassin, and another clerical employee were authorized to retrieve the mail from Peak’s mailbox, but confirmed that “Ms. Tassin would more often than not volunteer to retrieve the mail; especially on Mondays when [Peak] would receive larger portions of mail.” She further stated that when Ms. Tassin “was on vacation or absent, [her] desk was always locked without access.” According to Ms. Hudson, her investigation revealed that Ms. Tassin “had manipulated the account status in a large number of files in order to conceal her embezzlement of over $182,000.00 ... during the three and a half years of her employment.”
The evidence in the record establishes a prima facie case of fault on Capital One’s *536 part in its employees’ failing to consistently follow its own published internal procedures on verification of the adequacy of the checks’ endorsements, despite deposition testimony relating to tellers’ discretion and permissible deviation from strict adherence to such procedures. On the other hand, sufficient evidence also exists such that reasonable minds could differ on the existence of Peak’s comparative fault contributing to its losses. Genuine issues of material fact exist on the issue of whether Peak, “can be 11fifaulted for entrusting a single staff member with the responsibility of handling [its] billing and reimbursement data” and placing her “in a position of unchecked control” over important aspects of the accounts receivable bookkeeping. See Rodrigue v. Olin Employees Credit Union, 406 F.3d 434, 452 (7th Cir.2005). See also Ashley-Hall Interiors Ltd., Inc. v. Bank of New Orleans, 389 So.2d 850, 853 (La.App. 4th Cir.1980). But cf. Med Data Serv. Bureau, 03-2754 at p. 14, 898 So.2d at 491. The evidence suggests that through her virtually exclusive control over the actual posting of payments to the accounts receivable ledger, Ms. Tassin was able for years to manipulate the content of that ledger and the related monthly aging receivables ledger reports, relied upon by Peak’s management.[5] Additionally, factual issues remain as to any fault on the part of Peak in allowing Ms. Tassin to have virtually exclusive control over the retrieval and distribution of the mail.
In summary, because genuine issues of material fact exist as to the adequacy of Peak’s managerial oversight of Ms. Tassin and the degree and extent of the parties’ respective comparative fault, summary judgment was inappropriate. See, e.g., Palazzo v. Baker, 94-1244, pp. 8-9 (La.App. 4th Cir.1/31/95), 652 So.2d 10, 14-15, writ denied, 95-1264 (La.6/23/95), 656 So.2d 1035; Nat’l Union Fire Ins. v. Hibernia Nat’l Bank, 258 F.Supp.2d 490, 492-93 (W.D.La.2003).
|17In conclusion, we find merit in all four of Capital One’s assignments of error. Accordingly, we reverse the trial court’s interlocutory judgment overruling the peremptory exception of prescription, sustain the exception, and dismiss with prejudice all claims relating to those 146 checks deposited into the Tassins’ checking account prior to November 24, 2003 as prescribed. We also reverse the summary judgment in favor of Peak, and remand this matter for further proceedings on Peak’s remaining claims, consistent with this opinion. All costs of this appeal are assessed to the plaintiff-appellee, Peak Performance Physical Therapy and Fitness, L.L.C.
JUDGMENT OVERRULING EXCEPTION REVERSED; EXCEPTION SUSTAINED AND CAUSE OF ACTION DISMISSED IN PART, WITH PREJUDICE; SUMMARY JUDGMENT REVERSED AND CASE REMANDED.
McClendon, j., concurs.

. Even a partial summary judgment under La. C.C.P. art. 966(E), dispositive of a particular defense, cannot properly be designated as a final judgment for purposes of appeal. La. C.C.P. art. 1915(A)(3).

. These provisions of former La. R.S. 10:1— 102 are presently set forth in La. R.S. 10:1— 103(a), as enacted by Acts 2006, No. 533, § 1.

. The current language of La. R.S. 10:3— 420(f) expressly provides for a one-year prescriptive period for a conversion action.

. The described changes in Peak's internal process of managing billing and accounts receivable might be interpreted as a subsequent remedial measure, and therefore would conceivably be inadmissible “to prove negligence or culpable conduct in connection with the event.” La. C.E. art. 407. However, no objection was made to the filing or consideration of such evidence in connection with the determination of the motion for summary judgment. Thus, in our de novo review of the summary judgment, we must properly consider such evidence in determining whether a genuine issue of material fact exists as to any comparative fault on Peak's part.

. The employer in Rodrigue "did not seek to familiarize herself with the [receivables security software] system or to have the range of reports prepared that would have alerted her to the adjustments that [the employee] was making in order to cover her embezzlement. Instead, she relied exclusively on accounts receivable reports, which lacked the clues that other reports would have given her to [the employee's] fraud.” Rodrigue, 406 F.3d at 451. As noted by the amicus curiae, the record in this matter does not reveal the extent of Mr. Purvis’s knowledge or experience in accounting principles and analysis, nor the extent of any independent review of the original bookkeeping entries and data from which the aging receivables ledger report and any other "management reports” were prepared.