GAIDRY, J.
 

 |PA close corporation that was the victim of alleged forgery and theft by a former employee appeals a summary judgment dismissing its claims against the bank at which it maintained its checking account. For the following reasons, we affirm.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 ASP Enterprises, Inc. (ASP), doing business as Action Screen Printers, is a corporation primarily engaged in the business of silk screen printing in Covington, Louisiana. At the times relevant to this matter, its president and sole stockholder was Sidney Guillot, and its secretary-treasurer was his wife, Blanch Guillot. ASP’s business premises were situated on the same property on which the Guillots’ family residence was located.
 

 ASP maintained a checking account at Parish National Bank (the Bank) in Cov-ington. Mr. and Mrs. Guillot were the
 
 *967
 
 authorized signatories for the checking account.
 

 Around 1989, ASP hired Terry Guillory as a commission salesman. Sometime around 1993 or 1994, Mr. Guillot began to experience multiple health problems that by 1996 prevented him from working in his business on a daily basis. Terry Guillory gradually assumed various managerial duties due to the frequent absences of Mr. and Mrs. Guillot, eventually assuming full control of the business’s financial affairs and daily operations. At some point around that time, apparently due to cash flow problems and overdrafts of its checking account, the business adopted the policy of issuing money orders to pay its creditors rather than issuing checks drawn on its demand deposit accounts.
 

 [ ^According to ASP, Terry Guillory began to embezzle money from ASP through a number of methods, including forging Mrs. Guillot’s name on checks drawn on ASP’s checking account (the forged ASP checks) for cash or to purchase money orders, and indorsing and cashing third-party customer checks payable to ASP (the third-party checks). According to ASP, Terry Guillory also created fictitious payee invoices, including some for a fictitious entity named “Goodbee Screen Printers,” billing ASP customers for jobs actually performed by ASP, cashing checks payable to the fictitious payees, and retaining the proceeds. Many, if not all, of the ASP and third-party checks were cashed or processed at the Goodbee Quick Stop (Goodbee), a convenience store co-owned by Kevin Guillory, Terry Guillory’s brother, and Eunice Langhauser, the Guillorys’ mother. Goodbee also maintained a checking account at the Bank, from which Goodbee obtained large sums of cash for use in its check-cashing business operations. Terry Guillory had no account at the Bank.
 

 In the summer of 2003, Terry Guillory left his employment with ASP after a verbal altercation with the Guillots’ son, Ryan Guillot, who had begun working at ASP a year or more prior to that time. According to an affidavit of Sidney Guillot, in July 2003 he discovered that a supposedly unpaid invoice to a customer had in fact been paid by check, but that the check had been cashed at Goodbee and then deposited in Goodbee’s account at the Bank. Mr. Guillot made further inquiries and determined that other third-party checks had been similarly handled, and that Mrs. Guillot’s signature had been forged on many ASP checks.
 

 On December 15, 2003, ASP filed a petition for damages, naming as defendants Terry Guillory, Kevin J. Guillory, Eunice M. Langhauser, and the Bank. ASP alleged that after Mr. Guillot became ill and Mrs. Guillot 14attempted to conduct the business, Terry Guillory “seized the opportunity to expand his
 
 apparent control
 
 of the business operations.” (Emphasis added.) ASP also alleged that in doing so, Terry Guillory “eventually took it upon himself to
 
 purchase materials,
 
 contract with customers,
 
 create and invoice customers for work performed, accept payments for work performed,
 
 and sundry other functions.” (Emphasis added.) ASP alleged that Kevin Guillory, as Terry Guillory’s brother and as Goodbee’s manager, was aware that Terry Guillory was converting ASP’s assets for his personal use. ASP further alleged that both Good-bee and the Bank knew or should have known of Terry Guillory’s alleged embezzlement.
 

 The Bank answered ASP’s petition, denying its liability and asserting a cross-claim against the other defendants for indemnity. Terry Guillory answered the petition and cross-claim, denying his liability, and in turn asserted a reconventional de
 
 *968
 
 mand against ASP and a third-party demand against Sidney Guillot, claiming unpaid wages and breach of a contract to convey an ownership interest in ASP.
 

 On July 24, 2006, ASP filed a supplemental and amended petition, reiterating the allegations of its original petition, but adding allegations and asserting causes of action against all defendants under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961,
 
 et seq.
 
 and for conversion under Louisiana law, against Terry Guillory for breach of fiduciary duty, and against the Bank for negligence under Louisiana law.
 

 On January 7, 2008, the Bank filed two motions for partial summary judgment. One motion addressed ASP’s claims against the Bank governed by the Louisiana Uniform Commercial Code (UCC), La. R.S. 10:1-101,
 
 et seq.
 
 (the UCC motion). The other addressed ASP’s claims against the Bank under RICO (the RICO motion).
 

 lijTVte
 
 Trial Court’s Action
 

 The Bank’s motions for partial summary judgment were heard by the trial court on February 25, 2008. On March 11, 2008, the trial court issued its combined “Reasons for Judgment and Judgment,” granting both the UCC motion and the RICO motion.
 
 [1]
 
 However, the judgment did not contain decretal language dismissing the UCC and RICO claims against the Bank, dismissing the Bank as a defendant, or designating either partial summary judgment as final and appealable under La. C.C.P. art. 1915(B). In its reasons for judgment, the trial court noted with regard to the checks drawn on ASP’s account that the Bank was “under no duty to furnish copies of the checks with the bank statements,” and that Mr. Guillot offered no evidence in his affidavit of the date he requested copies of the checks that he claimed the Bank supposedly delayed in producing to him. As to the third-party checks payable to ASP, the trial court found that “[n]o affidavits or other evidence was presented by [ASP] which questioned the [Blank’s operating procedures and there was no evidence that the Bank had notice that Terry Guillory was forging or wrongly [sic ] endorsing company checks.”
 

 On April 28, 2008, the Bank filed a “Motion for Clarification and Motion to Designate Judgment as Final,” seeking clarification óf the decretal effect and finality of the judgment of March 11, 2008, granting the Bank’s UCC motion and RICO motion. On May 30, 2008, the trial court signed a judgment denying the former motions. Thereafter, the Bank filed a new motion for summary judgment, expressly seeking the dismissal of all of LASP’s claims against the Bank.
 
 [2]
 
 The Bank’s new motion for summary judgment was heard on June 30, 2008, and was granted by judgment signed on July 11, 2008, dismissing with prejudice all claims of ASP against the Bank.
 
 [3]
 

 
 *969
 
 ASP now appeals. An
 
 amicus curiae
 
 brief has also been submitted by the Louisiana Bankers Association.
 

 ASSIGNMENTS OF ERROR AND ISSUES ON APPEAL
 

 ASP contends that the trial court committed error in the following described respects:
 

 1. The trial court erred in assuming or finding that [the Bank], as depository bank, was a holder, under La. R.S. 10:1-201(21), or a holder-in-due-course under La. R.S. 10:3-302(1) and (2), of the checks at issue;
 

 2. The trial court erred in granting [the Bank], as a mere transferee, any rights against ASP greater than its transferor had under La. R.S. 10:3-201(b);
 

 3. If [the Bank] only succeeds to the rights of a criminal co-conspirator, the trial court erred in allowing [the Bank] to benefit from the safe harbor protections of negotiable instrument laws such as ... comparative negligence, prescription, burden-shifting and statutory presumptions.
 

 4. The trial court committed reversible error when it found that no evidence existed that [the Bank] had any notice that Terry Guillory, an employee of ASP [,] was forging or wrongfully endorsing company checks.
 

 5. The trial court committed reversible error when it found that [the Bank] observed reasonable commercial standards as the depositary and drawer bank.
 

 6. The trial court committed reversible error when it concluded that no evidence existed to support ASP’s claim that [the Bank] failed to maintain or apply its bank account |7oversight and maintenance procedures in a commercially reasonable manner.
 

 7. The trial court committed reversible error when it failed to distinguish and analyze the different factual methods employed by Terry Guillory to embezzle from ASP.
 

 8. The trial court committed reversible error when it failed to apply the applicable [UCC] provisions to each of the distinct methods of embezzlement ... and how each method, under La. R.S. 10:3-101,
 
 et seq.,
 
 invoked different statutory liability and, in turn, different statutory presumptions and defenses.
 

 9. The trial court committed reversible error when it concluded that because ASP failed to supervise its financial affairs by entrusting the majority of day-to-day management ... to its employee, Terry Guillory, the risk of loss caused by his fraudulent endorsements should be exclusively borne by ASP.
 

 10. The trial court erred in granting ... summary judgment as to the issue of prescription.
 

 11. The trial court erred in declining to apply the doctrine of
 
 contra non va-lentem.
 

 12. The trial court erred in granting [the Bank’s] [m]otion for [s]ummary Q]udgment and exception of prescription, as to the [UCC] claims.
 

 [13.] The trial court erred in granting [the Bank’s] [m]otion for [s]ummary [¡Judgment as to all remaining claims.
 

 In addition to the issues inherent in the foregoing assignments of error, ASP raises the following legal issues for our review:
 

 [1.] Should this Court reexamine its ruling in
 
 Peak Performance Physical Therapy & Fitness, LLC v. Hibernia Corp.,
 
 [07-2206 (La.App. 1st Cir.6/6/08),
 
 *970
 
 992 So.2d 527,
 
 writ denied,
 
 08-1478 (La.10/3/08), 992 So.2d 1018], that in applying the prescriptive period of La. R.S. 10:3-420(f) (conversion of funds) the principle of
 
 contra non valentem
 
 should only apply if there is “fraudulent concealment” by the depository or drawer bank?
 

 [2.] Did the trial court err in concluding that the causes of action under the [UCC] supplant all additional claims and causes of action which ASP may have against [the Bank]?
 

 The Bank frames the issues before us in terms of the defenses it raised to the claims for the third-party checks under La. R.S. 10:3-405(b) and La.|«R.S. 10:3-420(1). As to the forged ASP checks, the Bank frames the issues in terms of its defenses under La. R.S. 10:4-406(d)(2), 4-406(f), and 4-111.
 

 Finally, both the Bank and the
 
 amicus curiae
 
 urge us to reaffirm the relevant holding in
 
 Peak Performance, supra,
 
 which strictly limited application of
 
 contra non valentem.
 

 STANDARD OF REVIEW: SUMMARY JUDGMENT
 

 This matter comes to us on appeal from a summary judgment, effectively dismissing a defendant from the action. It is therefore subject to
 
 de novo
 
 review as to whether summary judgment was appropriate.
 
 Motorola, Inc. v. Associated Indem. Corp.,
 
 02-0716, p. 5 (La.App. 1st Cir.6/25/04), 878 So.2d 824, 828,
 
 writs denied,
 
 04-2314, 04-2323, 04-2326, 04-2327 (La.11/19/04), 888 So.2d 207, 211, 212. In undertaking our
 
 de novo
 
 review, we employ the same standards applicable to the trial court’s determination of the issues.
 
 Peak Performance Physical Therapy & Fitness, LLC v. Hibernia Corp.,
 
 07-2206, p. 5 (La.App. 1st Cir.6/6/08), 992 So.2d 527, 530,
 
 writ denied,
 
 08-1478 (La.10/3/08), 992 So.2d 1018.
 

 The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of nondomestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Louisiana Code of Civil Procedure article 967(A) provides that “[supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.”
 

 RThe mover has the burden of proof that he is entitled to summary judgment.
 
 See
 
 La. C.C.P. art. 966(C)(2). If the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent’s claim, action, or defense.
 
 See
 
 La. C.C.P. art. 966(C)(2). If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the nonmov-ing party must produce factual support sufficient to satisfy his evidentiary burden at trial.
 
 See
 
 La. C.C.P. art. 966(C)(2). If the mover has put forth supporting proof through affidavits or otherwise, the adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B).
 

 
 *971
 
 DISCUSSION
 

 Holder in Due Course Status
 

 ASP’s first three designated assignments of error present the question of the Bank’s alleged status as a mere “transferee” under La. R.S. 10:3-203, as opposed to status as a “holder in due course” under La. R.S. 10:3-301,
 
 et seq.,
 
 and La. R.S. 10:4-205. As correctly emphasized by the Bank and the
 
 amicus curiae,
 
 the issues and arguments relating to “holder in due course” status were never raised or submitted to the trial court for determination. Our jurisprudence has a longstanding general rule that issues not submitted to the trial court for decision will not be considered for the first time on appeal.
 
 Judson v. Davis,
 
 04-1699, p. 23 (La.App. 1st Cir.6/29/05), 916 So.2d 1106, 1121,
 
 writ denied,
 
 05-1998 (La.2/10/06), 924 So.2d 167.
 
 See also
 
 Rule 1-3, Uniform Rules of Louisiana Courts of Appeal.
 

 11 nIn its reply brief, ASP implicitly acknowledges that the issues relating to “holder in due course” status were not addressed at the trial court level. Nevertheless, it urges us to review these issues under Rule 1-3’s exception that authorizes review of issues not submitted to the trial court if “the interest of justice clearly requires” such review. After considering the nature of the issues and ASP’s related arguments, we conclude that such review is inappropriate and pretermit consideration of ASP’s first three assignments of error.
 
 [4]
 

 The Checks at Issue
 

 The record of this matter contains photocopies of a large number of third-party checks payable to ASP, checks written on ASP’s checking account at the Bank, and money orders cashed at Goodbee. However, many of those documents were simply attached as
 
 in globo
 
 exhibits to various memoranda of the parties, without verification by affidavit, deposition, admissions, or answers to interrogatories.
 

 A party may not utilize unsworn and unverified documents as summary judgment evidence.
 
 Sanders v. J. Ray McDermott, Inc.,
 
 03-0064 p. 4 (La.App. 1st Cir.11/7/03), 867 So.2d 771, 775. A document which is not an affidavit or sworn to in any way, or which is not certified or attached to an affidavit, is not of sufficient evidentiary quality to be given weight in determining whether there are remaining genuine issues of material fact.
 
 Id.; Robertson v. Northshore Reg’l Med. Center,
 
 97-2068, pp. 5-6 (La.App. 1st Cir.9/25/98), 723 So.2d 460, 464. Likewise, an unsworn, uncertified document simply attached to a memorandum may not properly be considered by the court in determining a motion for summary judgment.
 
 State v. Exxon Corp.,
 
 95-2501, pp. 7-8 (La.App. 1st Cir.6/28/96), 676 So.2d 783, 787.
 

 
 *972
 
 After careful review of the record, as well as the parties’ briefs, it appears undisputed that the checks at issue form part of a set of documents Bates-stamped A0001 through A0310, identified by ASP in its answers to interrogatories as the checks forming the basis of its claims. The third-party checks are contained in that portion of documents numbered A0001 through A0187 (although some ASP checks are also contained therein), and ASP’s checks that were allegedly forged (with the exception of those mentioned above) are contained in the remaining documents numbered A0188 through A310.
 

 The Third-Party Checks
 

 Louisiana Revised Statutes 10:3-420 provides, in pertinent part:
 

 (a) An instrument is converted when
 

 [[Image here]]
 

 (iii) it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.
 

 [[Image here]]
 

 (f) Any action for conversion ... prescribes in one year.
 

 Terry Guillory’s alleged actions relating to the third-party checks payable to ASP and the third-party checks payable to fictitious payees |12clearly constituted conversions under La. R.S. 10:3 — 420(a)(iii).
 
 [5]
 
 If ASP’s allegations as to the Bank’s actions are accepted as true, then those actions in accepting the deposits of the misappropriated checks and thereby making payment to Goodbee would also constitute conversions within the meaning of the statute.
 
 See Peak Performance,
 
 07-2206 at p. 7, 992 So.2d at 531, and
 
 Med Data Serv. Bureau, L.L.C. v. Bank of La. in New Orleans,
 
 03-2754, pp. 9-10 (La.App. 1st Cir.12/20/04), 898 So.2d 482, 488-89.
 

 The Bank established a
 
 prima facie
 
 case of prescription of all claims for conversion based upon the third-party checks deposited prior to December 15, 2002, a year prior to filing of suit.
 
 See Quality Gas Products,
 
 03-1859 at pp. 5-6, 885 So.2d at 1182, and
 
 Metro Elec. & Maint, Inc. v. Bank One Corp.,
 
 05-1045, pp. 4-8 (La.App. 3rd Cir.3/1/06), 924 So.2d 446, 449-51. The Bank having established a
 
 prima facie
 
 case of prescription as to the checks cashed at Goodbee and deposited over a year prior to suit being filed, the burden of proof that those claims were not prescribed shifted to ASP. As the party asserting the benefit of
 
 contra non valentem,
 
 ASP bore the burden of proof of its requisite elements and applicability.
 
 See Black v. Whitney Nat’l Bank,
 
 618 So.2d 509, 516 (La.App. 4th Cir.),
 
 writ denied,
 
 623 So.2d 1308 (La.1993).
 

 At this point, it is appropriate that we address ASP’s last assignment of error, as its determination bears upon the nature of
 
 *973
 
 ASP’s cause of action 11sfor conversion and the applicability of the general doctrine of
 
 contra non valentem
 
 relating to that cause of action. This assignment of error addresses the issue of whether ASP may properly assert causes of action against the Bank under Louisiana law, independent of the UCC, for conversion and negligence. In other words, ASP contends that the trial court erred in implicitly concluding that any such non-UCC causes of actions were supplanted or displaced by the UCC provisions addressing such theories of recovery.
 
 See
 
 La. R.S. 10:1 — 103(b).
 
 [6]
 
 The resolution of this issue directly affects whether ASP may invoke the doctrine of
 
 contra non valentem
 
 to defeat the Bank’s defense of prescription relating to ASP’s reimbursement claim based upon the third-party checks.
 

 In
 
 Peak Performance,
 
 although we did not expressly invoke the “displacement” concept embodied in La. R.S. 10:l-103(b), we implicitly rejected the plaintiffs theory of recovery that the defendant bank “passively allowed” the embezzlement by the plaintiffs employee of third-party checks payable to the plaintiff. Instead, we correctly recognized its cause of action as one for conversion under La. R.S. 10:3-420.
 
 Peak Performance,
 
 07-2206 at p. 7, 992 So.2d at 531. We emphasized in that opinion that “Louisiana follows the model of the [UCC] in characterizing the nature of the conversion action....”
 
 Id.,
 
 07-2206 at p. 10, 992 So.2d at 532. Citing
 
 Pargas, Inc. v. Estate of Taylor,
 
 416 So.2d 1358, 1364-65 (La.App. 3rd Cir.1982), we observed that “UCC provisions should be construed so that rights and liabilities of the parties, absent serious factual dispute, are ascertainable without resort to expensive and delaying litigation over each item that might |]4be paid on an unauthorized signature or endorsement, thereby facilitating commercial transactions.”
 
 Id.,
 
 07-2206 at p. 11, 992 So.2d at 533.
 

 Nationwide, in cases involving check fraud, “a large number of courts refuse to allow any general common law claims, conversion claims, or negligence actions when not expressly authorized by the U.C.C.” A. Brooke Overby,
 
 Check Fraud in the Courts After the Revisions to U.C.C. Articles 3 and 4,
 
 57 Ala. L.Rev. 351, 391-92 (2005). (Footnotes omitted.) Any uncertainty as to the viability of such non-UCC actions “significantly raises the cost of litigation, generates unpredictable results, and can reduce incentives for corporate officers to supervise and control their employees.”
 
 Id.
 
 at 397. Such uncertainty would be contrary to the UCC’s goals of simplicity, clarity, and uniformity.
 
 See
 
 La. R.S. 10:1-103(a).
 

 Given the foregoing considerations, we conclude that ASP’s claims for conversion and negligence grounded in general Louisiana law outside the ambit of the UCC are displaced by the UCC. The trial court did not err in dismissing such claims in its final summary judgment based upon the pleadings and other documents properly before us in the record. However, we choose to limit our holding adopting the displacement concept of La. R.S. 10:1-103(b) to the facts of this case. In summary, any claim of ASP for conversion of third-party checks falls strictly within the purview of La. R.S. 10:3-420.
 

 In
 
 Peak Performance,
 
 we were “squarely confronted with the threshold issue of
 
 *974
 
 whether the doctrine [of
 
 contra non valen-
 
 tem] has application to the issue of prescription under La. R.S. 10:3 — 420(f).”
 
 Id.,
 
 07-2206 at p. 8, 992 So.2d at 532. We thoroughly examined the statutory background, the prior Louisiana jurisprudence, and relevant jurisprudence of other jurisdictions. We ultimately held that “the equitable doctrine of
 
 contra \1Ron valentem
 
 cannot be applied to suspend prescription of a cause of action for the conversion of a negotiable instrument under La. R.S. 10:3-420(f), except in the event of fraudulent concealment by the defendant asserting prescription, a limited application of the third category of
 
 contra non valentem.” Id.,
 
 07-2206 at p. 11, 992 So.2d at 533. The customer in
 
 Peak Performance
 
 neither alleged nor presented evidence tending to establish any fraudulent concealment on the bank’s part. It therefore failed to meet its burden of proof of suspension of prescription under the narrow
 
 contra non valentem
 
 exception.
 

 ASP urges us to reconsider our holding in
 
 Peak Performance.
 
 We decline. The policy considerations of certainty and uniformity upon which we based our holding in
 
 Peak Performance
 
 have not changed, nor has ASP convincingly put forth any opposing considerations warranting change or modification of the holding.
 

 In its petition and its brief on appeal, ASP does not identify the third-party checks at issue with any particularity as to date. However, as previously noted, it appears undisputed that the third-party checks at issue were identified by ASP in its answers to interrogatories as forming part of the group Bates-numbered for identification as “A0001” through “A0187.” We have reviewed those documents, and it is apparent that only a portion of them actually constitute third-party checks payable to ASP. The majority of those were deposited or posted prior to December 15, 2002. As such, any causes of action relating to those checks are prescribed on their face.
 

 Given the foregoing, the narrow issue before us with regard to the third-party checks deposited prior to December 15, 2002 is whether there is genuine issue of material fact relating to any fraudulent concealment by the |1fiBank relating to those cheeks, entitling ASP to invoke the narrow
 
 contra non valentem
 
 exception
 
 of Peak Performance
 
 to defeat summary judgment.
 

 In his affidavit, Mr. Guillot claimed that he first discovered in July 2003 that Terry Guillory had converted a third-party check for $2,500.00 payable to ASP by cashing it at Goodbee, which in turn stamped its endorsement and deposited the check into its account at the Bank. According to Mr. Guillot, within two days he discovered that approximately $16,000.00 in third-party checks payable to ASP had been cashed at Goodbee and deposited into Goodbee’s account. After that discovery, Mr. Guillot “began pressing [the] Bank for information concerning not only checks drawn to [ASP] that had been deposited by [Goodbee] but [ASP’s] own checks as well.” At that point, according to Mr. Guillot, “the [B]ank kept stalling [his] inquiries.” He attested that he had previously been told that copies of ASP’s own cancelled checks were not included on its bank statements. He claimed in his affidavit that “the reason the [B]ank did not give [ASP its] checks” was “apparently to conceal the scheme.”
 

 Considering the affidavit of Mr. Guillot, the only suggestion of “fraudulent concealment” on the Bank’s part relates to its alleged failure to provide copies of ASP’s cancelled checks and its alleged “stalling” in producing them during some indeterminate period after July 2003. Mr. Guillot’s conclusory statements in that regard are
 
 *975
 
 insufficient to give rise to any inference of fraud or fraudulent concealment. As previously noted, allegations of time are material in factual allegations, and evidence of the time period of any fraudulent concealment by the Bank is a crucial element of ASP’s burden of proof that the limited
 
 contra non valentem
 
 exception may be applicable. We agree with the Bank that ASP did not offer competent proof of any such “fraudulent concealment” by the Bank prior to |17the time that suit was filed. The trial court did not err in refusing to apply the limited doctrine of
 
 contra non valentem
 
 as articulated in
 
 Peak Performance.
 
 Accordingly, all claims of ASP relating to conversion of third-party checks prior to December 15, 2002 are prescribed under La. R.S. 10:3 — 420(f). This result applies even with regard to those checks cashed by Terry Guillory and deposited by Goodbee without any endorsements.
 
 See, e.g., Metro Elec. & Maint., Inc. v. Bank One Corp.,
 
 05-1045, pp. 6-7 (La.App. 3rd Cir.3/1/06), 924 So.2d 446, 450-51.
 

 As to the small remainder of the identified third-party checks deposited on or after December 15, 2002, we conclude, as did the trial court, that ASP’s claims related to such checks are precluded by virtue of La. R.S. 10:3-405(b), which provides:
 

 For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection,
 
 if an employer entrusted an employee ivith responsibility loith respect to the instrument
 
 and the employee or a person acting in concert with the employee makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made in the name of that person. If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.
 

 (Emphasis added.)
 

 Louisiana Revised Statutes 10:3-405(a)(3) provides:
 

 “Responsibility
 
 ” with respect to instruments means authority (i) to sign or indorse instruments on behalf of the employer, (ii)
 
 to process instruments received by the employer
 
 for bookkeeping purposes, for deposit to an account, or
 
 for other disposition,
 
 (iii)
 
 to prepare or process instruments for issue in the name of the employer,
 
 (iv)
 
 to supply information determining the names or addresses of payees of instruments to be issued in the name of the employer,
 
 (v)
 
 to control the disposition of instruments to be issued in the name of the
 
 11Semployer, or (vi)
 
 to act otherwise with respect to instruments in a responsible capacity.
 
 “Responsibility” does not include authority that merely allows an employee to have access to instruments or blank or incomplete instrument forms that are being stored or transported or are part of incoming or outgoing mail, or similar access.
 
 [7]
 

 (Emphasis added.)
 

 Despite the Guillots’ insistence that Terry Guillory was not an authorized signato
 
 *976
 
 ry for ASP’s checks, the uncontradicted evidence shows that he had the apparent or implied authority to handle virtually all aspects of ASP’s financial affairs while he was “running the business” in the Guillots’ absence, and that while doing so he also had the “apparent control” or authority to manage and negotiate its financial instruments. In his deposition, Terry Guillory testified that he occasionally had to sign ASP checks under Mrs. Guillot’s name, due to the Guillots’ absence, that the Guil-lots were made aware of such actions, and that they ratified them after being so advised. In fact, the Guillots’ own affidavits strongly suggest that Terry Guillory must have had either the
 
 actual
 
 or implied authority to endorse checks and to issue ASP checks for the purchase of money orders in order to be able to “run the business” and to “fully [control] all of the financial affairs of the business.” Even if genuine issue might exist as to the extent of Terry Guil-lory’s express or formal authority to sign or endorse checks for ASP, it is undisputed that ASP and the Guillots delegated broad and almost unlimited managerial and financial responsibility to him, plainly extending beyond mere access to business checks or business mail, and falling within the statutory definition of “responsibility.”
 

 | U|In his affidavit filed in the record, Mr. Guillot described Terry Guillory as “like a son to [him],” and stated that he “deeply trusted” him prior to the discovery of his alleged misappropriation of ASP’s funds. He confirmed that after his illnesses essentially disabled him, “Terry [Guillory] started trying to take control of the business and ran the day-to-day operations.” Mr. Guillot explained that Terry Guillory “may have been the only one at [ASP they] thought near capable of doing so.” He explained that although Mrs. Guillot “made an attempt to run the business” after he became disabled from doing so, she had previously performed “only minor tasks and errands for the business from time to time,” and “had no idea how to manage a business or any of its affairs.”
 

 In her affidavit, Mrs. Guillot stated that she was employed by ASP, but confirmed that “[w]hile he was running [ASP], [Terry Guillory] fully controlled all of the financial affairs of the business.” She confirmed her trust in Terry Guillory during her husband’s illnesses, and further verified that Terry Guillory “basically took it upon himself to start running the business” and that she “had no reason to doubt his efforts to do so [and] anything to keep [her] husband’s business afloat.” Mrs. Guillot explained that Terry Guillory “handled all the mail of the business, including the monthly bank statements from [the Bank] and checks received from customers.” She claimed, however, that she “never authorized him to sign [her] name on anything and his name was not on the signature cards at the [B]ank for [ASP.]” Although Mrs. Guillot held the position of secretary-treasurer for the business, she admitted in her affidavit that she “had no clue as to how to run any business or to handle any of the financial matters related to it.”
 

 |2ftAfter careful review of the record, we further note that ASP has never disputed or controverted the fact that the “money order policy” was an authorized business practice of ASP. Although it is unclear who with ASP instituted that practice, it is undisputed that Terry Guillory had the full authority, while acting as ASP’s
 
 de facto
 
 manager, to handle the financial transactions necessary to keep the business operating.
 
 [8]
 
 Based upon the allegations of
 
 *977
 
 ASP’s petition, as amended, and the evidence, it is undisputed that the “money order policy” was known to and accepted by the Guillots during the time period it was in place.
 

 ASP contends on appeal that “it is questionable as to whether the [B]ank followed its own procedures in honoring the checks and whether those procedures comply with reasonable banking standards.” However, ASP does not point to specific factual circumstances upon which a conclusion that genuine issue of material fact exists on those points. The record shows that ASP did not offer any competent proof relating to the Bank’s alleged failure to comply with its internal procedures, nor any proof of failure to comply with reasonable banking standards under the circumstances.
 
 See Cable Cast Magazine v. Premier Bank, Nat’l Ass’n,
 
 98-0676, pp. 6-7 (La.App. 1st Cir.4/1/99), 729 So.2d 1165, 1168-69.
 

 The mere fact that a forgery of a signature on a check is not detected does not prove that a bank’s signature verification procedures are not in accordance with reasonable commercial standards of the banking industry.
 
 See Gulf States Section, PGA, Inc. v. Whitney Nat’l Bank of New Orleans,
 
 96-0844, p. 9 (La.App. 4th Cir.2/12/97), 689 So.2d 638, 648. Here, ASP 121failed to offer competent proof that the Bank’s practices failed to comport with ordinary care, or the “observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged.”
 
 See
 
 La. R.S. 10:3-103(a)(7). The statutory definition of “ordinary care” suggests that “adherence to local business standards and practices can be equated with the exercise of ordinary care, even if those practices are not necessarily in the customer’s interest.” Overby,
 
 supra
 
 at 379. The excerpts from the deposition testimony of the Bank employees offered by ASP simply do not demonstrate a deviation from either the Bank’s own procedures or local banking standards and practices.
 

 The Forged ASP Checks
 

 A person is not liable on a negotiable instrument unless that person or his agent or representative signed it. La. R.S. 10:3-401;
 
 Prestridge v. Bank of Jena,
 
 05-545, p. 3 (La.App. 3rd Cir.3/8/06), 924 So.2d 1266, 1270,
 
 writ denied,
 
 06-0836 (La.6/2/06), 929 So.2d 1261. Thus, the general rule is that when a bank pays on a forged check, it is liable for the amount of the check, plus legal interest from the date of judicial demand.
 
 See Marx v. Whitney Nat’l Bank,
 
 97-3213, p. 4 (La.7/8/98), 713 So.2d 1142, 1145;
 
 Peak Performance,
 
 07-2206 at p. 12, 992 So.2d at 533. However, there are several statutory exceptions to the general rule, and the Bank has raised them as defenses to ASP’s claims relating to the ASP forged checks.
 

 Louisiana Revised Statutes 10:4-406 provides:
 

 (a) A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid
 
 or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information if the item is described by item number, amount, and date of payment.
 

 
 *978
 
 122(b) If the items are not returned to the customer, the person retaining the items shall either retain the items or, if the items are destroyed, maintain the capacity to furnish legible copies of the items until the expiration of seven years after receipt of the items.
 
 A customer may request an item from the bank that paid the item, and that bank must provide in a reasonable time either the item or, if the item has been destroyed or is not otherwise obtainable, a legible copy of the item.
 

 (c) If a bank sends or makes available a statement of account
 
 or items pursuant to Subsection (a),
 
 the customer must exercise reasonable promptness in examining the statement
 
 or the items
 
 to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement
 
 or items
 
 provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.
 

 (d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:
 

 (1) the customer’s unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and
 

 (2) the customer’s unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding thirty days, in which to examine the item or statement of account and notify the bank.
 

 (e)If Subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with Subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the customer proves that the bank did not pay the item in good faith, the preclusion under Subsection (d) does not apply.
 

 (fi Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement
 
 or items
 
 are made available to the customer (Subsection (a)) discover and report the customer’s^unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.
 
 If there is a preclusion under this Subsection, the payor bank may not recover for breach of warranty under R.S. 10:4-208 with respect to the unauthorized signature or alteration to which the preclusion applies.
 

 (Emphasis added.)
 

 In its written reasons for judgment, the trial court observed that under the foregoing provision, “[t]he [B]ank is under no duty to furnish copies of the checks with the bank statements.” This is a correct statement of the law.
 
 See
 
 La. R.S. 10:4-406, Revised Uniform Commercial Code Comment, (1). As noted by one commentator:
 

 
 *979
 
 A bank is not required to send the original checks back with the statement, a practice known as truncation.... Rather, the statutory requirement is that a bank “shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid.” [Citation omitted.] Describing an item by item number, amount, and date of payment is sufficient to meet this test.
 

 Overby, supra
 
 at 372 n. 136.
 

 In her deposition, Mrs. Guillot testified that with regard to ASP’s monthly bank statements, it was the practice from 1996 through 2003 to simply place each statement into an envelope corresponding to its month and to mail or deliver the statements to the bookkeepers maintaining the business accounting records. She admitted that after Mr. Guillot became ill, she received the bank statements, but she “never looked at them,” nor did Mr. Guillot ever review them.
 

 The affidavit of Michael Nunmaker was also filed in the record on behalf of ASP. Mr. Nunmaker attested that he “tried to assist [Mr. Guillot] as best [he] could in the Summer of 2003 when he discovered that Terry Guillory had been stealing from the business[.]” He recalled asking the Guillots for copies of ASP’s bank statements, and reviewed them, noting 124that the statements did not include copies of the cancelled checks. According to Mr. Nunmaker, the envelope for the most recent statement available had not yet been opened, and upon opening it he observed that it did not include copies of cancelled checks. He added that Mrs. Guillot “told me that [the] Bank had not given [ASP] its cancelled checks for quite some time despite their repeated requests for the checks.” As our review is
 
 de novo,
 
 we must disregard the hearsay statement of Mrs. Guillot as not within the personal knowledge of Mr. Nunmaker, the affiant.
 

 Louisiana Revised Statutes 10:4— 406(d)(2) embodies the defense known generally as the “same wrongdoer” rule. This rule “imposes on the customer the risk of loss on all subsequent forgeries by the
 
 same wrongdoer
 
 after the customer had a reasonable time to detect an initial forgery if the bank has honored subsequent forgeries prior to notice.”
 
 Marx,
 
 97-3213 at p. 6, 713 So.2d at 1146. In
 
 Marx,
 
 the supreme court found that because the plaintiff did not review and notify the defendant bank of the initial forgeries appearing in a bank statement within thirty days of receipt of that statement, he was “precluded from asserting against the bank
 
 all subsequent forgeries
 
 by the
 
 same
 
 unauthorized signatory.”
 
 Id.,
 
 97-3213 at p. 7, 713 So.2d at 1147.
 

 It is undisputed that ASP did not notify the Bank within thirty days of the first ASP forged check appearing on its bank statement in 1997. It is likewise undisputed that the claimed forgeries were all made by the same alleged wrongdoer, Terry Guillory. Once the Bank established the foregoing facts, it was incumbent upon ASP to come forward with competent evidence that the Bank failed to exercise ordinary care in honoring the checks. As previously observed, the evidence in the record relating to the Bank’s practices falls short in that regard. Accordingly, we conclude that all of 12BASP’s claims relating to the forged ASP checks are barred by application of the “same wrongdoer” rule.
 
 See Peak v. Tuscaloosa Commerce Bank,
 
 96-1258, pp. 9-10 (La.App. 1st Cir.12/29/97), 707 So.2d 59, 64-5, and
 
 Prestridge,
 
 05-545 at pp. 13-19, 924 So.2d at 1275-79.
 

 In addition to the “same wrongdoer” rule, the Bank has asserted that La.
 
 *980
 
 R.S. 10:4-406(f) precludes ASP’s claims relating to the forged ASP checks. That provision provides that after a year from the date a statement is provided to the customer,
 
 all
 
 claims relating to unauthorized signatures or alterations on items in the statement are barred, regardless of the absence of exercise of ordinary care on the part of either the customer or the bank.
 

 The deposition testimony of Mrs. Guillot and Terry Guillory in the record confirms that ASP retained a number of successive bookkeepers over the period of time at issue, to whom the monthly bank statements were delivered for review and balancing, yet ASP inexplicably failed to notify the Bank of any discrepancies relating to the items reported on its bank statements until 2003 at the earliest, when suit was filed and ASP made general allegations of those discrepancies. Even then, there is no evidence in the record that ASP ever identified the items in question with any particularity until its answers to interrogatories were served in 2007. General notice to the bank that a theft or forgery has, or might have, occurred is not sufficient notice for purposes of La. R.S. 10:4 — 406(f). Rather, specific notice of the particular items at issue is required. Overby,
 
 supra
 
 at 401.
 
 See also First Place Computers, Inc. v. Sec. Nat’l Bank of Omaha,
 
 251 Neb. 485, 558 N.W.2d 57, 59-61 (1997). By 2007, ASP’s claims against 12fithe Bank for the forged ASP checks were long stale under both La. R.S. 10:4-406(d)(2) and La. R.S. 10:4-406(f).
 
 [9]
 

 As noted by one authority:
 

 In the most extreme cases of customer negligence, it is proper as a matter of policy that the law requires customers to bear the loss.... [T]he most significant defense that impacts customers’ ability to raise claims is section 4-406, the bank statement defense. Timely review of one’s bank statements is becoming a threshold for asserting bank liability under the [UCC], a threshold that is difficult for a substantial number of customers to meet. Unless a customer reviews their bank statement within thirty days of the bank’s sending it, significant losses in a continuing fraud ultimately may be borne by the customer through the “same wrongdoer” rule. Should a customer fail to review a statement within a one-year period — a seemingly not uncommon event given the recent cases that involve exactly such a failure — that failure will lead to the customer bearing the complete loss. Given the relatively low cost of performing such a review, the current judicial trend toward imposing those losses on these most negligent customers, where the basic requirements of the bank statement defense have not been met, is appropriate. In these cases, the customer is clearly in the best position to protect against many losses through the timely and adequate review of their statements.
 

 Consider companies which delegate both the payment and review functions to one party. This creates an environment facilitating a successful long term fraud, and in fact, in some instances, it is almost a requirement for a successful corporate theft.... While requiring statement review involves some costs to businesses, particularly small businesses, this basic requirement is a significant measure which advances the effort to reduce the overall incidence of fraud. [Footnotes omitted.]
 

 
 *981
 
 Overby,
 
 supra
 
 at 388-89. The unfortunate circumstances of the present action fit squarely within the case scenario described above.
 

 In summary, we conclude that none of ASP’s assignments of error have merit. Summary judgment was appropriately rendered.
 

 |27DECREE
 

 The summary judgment of the trial court dismissing with prejudice the causes of action and claims of the plaintiff-appellant, ASP Enterprises, Inc., against the defendant-appellee, Parish National Bank, is affirmed. All costs of this appeal are assessed to the plaintiff-appellant.
 

 AFFIRMED.
 

 [1]
 

 . Parenthetically, we note that it is technically improper to incorporate written reasons for judgment in the judgment itself.
 
 See
 
 La. C.C.P. art. 1918. Such action does not, however, serve to invalidate the judgment.
 
 Country Club of La. Prop. Owners Ass’n n. Dornier,
 
 96-0898, p. 13 (La.App. 1st Cir.2/14/97), 691 So.2d 142, 149.
 

 [2]
 

 . The filing of this motion for summary judgment was suggested by the trial court at the hearing of the prior motion for clarification on May 29, 2008. According to the transcript of the hearing, the trial court suggested that the filing of the new motion for summary judgment was necessary to address ASP’s contentions that it had viable claims for conversion and negligence under non-UCC Louisiana law.
 

 [3]
 

 .ASP has not appealed that portion of the judgment of the June 11, 2008 judgment that reaffirmed the prior granting of the RICO motion and the final dismissal of the RICO
 
 *969
 
 claims against the Bank. Thus, the RICO claims are not before us.
 

 [4]
 

 . ASP argues that the Bank must prove its status as a "holder in due course” in order to be entitled to assert the benefit of any "safe harbor,” prescription, and other defenses to ASP's claims. Acknowledging that there are no Louisiana cases supporting that position, ASP has cited the case of
 
 First State Bank & Trust Co. of Edinburg v. George,
 
 519 S.W.2d 198 (Tex.App.1974). The cited case, however, involved the different factual situation in which the plaintiff bank sought to enforce dishonored checks for which it had given credit against the checks' drawers. In order to defeat the drawers' personal defenses relating to the checks, it was necessary for the plaintiff bank seeking to enforce the checks to invoke the status of a "holder in due course.” The Bank in the present case is not seeking to enforce payment as a depository bank. Accordingly, the cited case does not support ASP's position. We agree with the Bank and
 
 amicus curiae
 
 that "holder in due course" status is irrelevant to the issues presented by ASP’s causes of action.
 

 [5]
 

 . ASP contends that La. R.S. 10:3-404 governs its claims relating to
 
 third-party
 
 checks (rather than ASP checks) payable to “Good-bee Screen Printers” and other alleged fictitious payees created by Terry Guillory. The Bank emphasizes that it never raised any “fictitious payee” defense relating to any checks issued or drawn on ASP's account. Based upon our review of the language of La. R.S. 10:3-404, particularly paragraphs (b) and (d), and the related UCC Comment, we conclude that the statute's provisions have no application to the proceeds of any
 
 third-party
 
 checks to which ASP claims it was rightfully entitled. Rather, the statute would only have relevance if ASP claimed that Terry Guillory issued ASP checks to fictitious payees. While ASP might have a claim for conversion under general Louisiana law against Terry Guillory for diversion of sums actually owed to ASP by the third parties issuing the checks, any conversion claim against the Bank must fall strictly within La. R.S. 10:3-420.
 

 [6]
 

 . This statute provides:
 
 “Unless displaced by the particular provisions of this Title,
 
 the other laws of Louisiana supplement its provisions.” (Emphasis added.) During the time period at issue in this matter, the present language of La. R.S. 10:1-103(b) constituted the entire text of former La. R.S. 10-1:103. The present version of La. R.S. 10:1-103 was enacted by Acts 2006, No. 533, § 1.
 

 [7]
 

 . This language tracks that of the UCC in other states.
 
 "Responsibility
 
 with respect to instruments is very broadly defined to cover most acts in a responsible capacity regarding instruments....” A. Brooke Overby,
 
 Check Fraud in the Courts After the Revisions to
 
 
 *976
 

 U.C.C. Articles 3 and 4,
 
 57 Ala. L.Rev. 351, 375 (2005).
 

 [8]
 

 . In his deposition filed in the record, Terry Guillory testified that the "money order poli
 
 *977
 
 cy" was not formally instituted by anyone on behalf of ASP, but evolved through necessity, due to a problem with ASP's checks to vendors being dishonored (''bouncing”). This testimony was not refuted by the Guillots or any other witness for ASP.
 

 [9]
 

 . Because we find that ASP's claims relating to the forged ASP checks are clearly barred under La. R.S. 10:4-406(d)(2) and 10:4-406(f), it is unnecessary for us to address the Bank’s additional defense of three-year prescription under La. R.S. 10:4 — 111.